UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
_____
                               :
JOSE LOPEZ,                    :
                               :      Civil Action
            Plaintiff,         :      No. 04-2155(NLH)
                               :
    v.                         :      OPINION
                               :
CORRECTIONAL MEDICAL SERVICES,:
et al.,                        :
            Defendants.        :
_____
```

**APPEARANCES**:

GREGG L. ZEFF
FROST & ZEFF, ESQS.
430 ROUTE 70 WEST
CHERRY HILL, NJ 08002
*Attorney for Plaintiff*

GARY J. LESNESKI
JEFFREY M. SCOTT
KERRI E. CHEWNING
ARCHER & GREINER, PC
ONE CENTENNIAL SQUARE
PO BOX 3000
HADDONFIELD, NJ 08033-0968
*Attorney for Defendants Correctional Medical Services, Inc.,*
*Louis Tripoli, William Andrade, M.D. James J. Neal, M.D., James*
*Ruman, R.N., Rock Welch and Abu Ahsan, M.D.*

DIANNE M. MORATTI
SARAH BRIE CAMPBELL
OFFICE OF NJ ATTORNEY GENERAL
RICHARD J. HUGHES JUSTICE COMPLEX
PO BOX 112
TRENTON, NJ 08625
*Attorneys for Defendants Devon Brown, Charles Leone, Warden,*
*Southern State Correctional Facility, Warden, New Jersey State*
*Prison*

FRANKLIN LEWIS FLACKS
ROTTKAMP & FLACKS, ESQS.
795 PARKWAY AVENUE
SUITE A-6, LEXINGTON MEWS
TRENTON, NJ 08618
*Attorney for St. Francis Hospital*

**HILLMAN, District Judge**

Plaintiff is currently incarcerated in a New Jersey state prison and has been diagnosed with hepatitis C.  He filed a complaint against Defendants claiming deliberate indifference to his serious medical needs, violation of his equal protection rights, violation of the Americans with Disabilities Act, medical malpractice, negligence, intentional and negligent infliction of emotional distress, and fraud.

Before the Court are three motions for summary judgment. For the reasons explained below, the motion filed by Defendants Devon Brown, Charles Leone, Warden, Southern State Correctional Facility, and Warden, New Jersey State Prison ("State Defendants") is granted; the motion filed by St. Francis Hospital ("St. Francis") is granted in part and denied in part; and the motion filed by Defendants Correctional Medical Services, Inc., Louis Tripoli, William Andrade, M.D. James J. Neal, M.D., James Ruman, R.N., Rock Welch and Abu Ahsan, M.D. ("CMS Defendants") is granted.

I.   **JURISDICTION**

Plaintiff has alleged that Defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights, that Defendants violated his equal protection rights under the Fourteenth Amendment, and violated his rights under the Americans with Disabilities Act 42 U.S.C. §

2

12131, et seq.  Thus, this Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).  The Court exercises supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367.

## II.  **BACKGROUND**

Plaintiff, Jose Lopez ("Lopez"), has been incarcerated in various state prisons in New Jersey since 1983.  From 1983 until 1996, Lopez was incarcerated at New Jersey State Prison (also known as Trenton State Prison).  From 1996 until 1998 he was incarcerated at Southern State Correctional Facility.  For nine months in 1998, he was incarcerated at Riverfront Prison and since late 1998, he has been incarcerated at Bayside Prison.  During the course of his incarceration, Lopez has a been disciplined for intravenous ("IV") drug use.

From the time Lopez was first incarcerated until 1996, the New Jersey Department of Corrections ("NJDOC") directly arranged for the provision of healthcare to inmates.  During this period, the NJDOC arranged for Lopez to be treated at St. Francis on numerous occasions.  In 1985, a test of Lopez's liver returned abnormal.  Following these results, Lopez was tested for hepatitis A and B (a test for hepatitis C ("HCV") was not available until 1989).  It is unclear what the results of these

tests were.[1]  In 1991, liver tests administered to Lopez again returned abnormal.  After suffering a head injury that resulted in a seizure in 1992, a spinal tap was performed and it was discovered that Lopez had HCV.  Although his discharge summary from St. Francis indicated "Hepatitis C antibody reactive," Lopez was never informed of his condition and was not given a copy of his records.  From 1992 to 1996, Lopez did not experience any major health problems, although he was seen periodically during this period, including for additional liver monitoring in 1994.

Medical records from outside treatment facilities were not automatically transferred to the NJDOC during this period. Further, while these records are available upon request, the NJDOC is not automatically advised of the treatment or diagnosis of inmates by outside medical facilities.  There is evidence in the record to suggest that had standard procedure been followed, the discharge records from St. Francis should have been included in Lopez's file at his place of incarceration.  However, procedure was not followed in Lopez's case and there is no evidence to suggest that the records from St. Francis ever made their way into Lopez's medical file at his place of incarceration.

---

[1] Although Lopes asserts in his Opposition Brief that he tested positive for hepatitis B ("HBV"), he has failed to cite to any evidence in support of that position.

On April 27, 1996, CMS began operating under its new contract with the NJDOC.  Pursuant to this contract, CMS was now responsible for arranging medical care for prisoners instead of the NJDOC.  Between 1996, when CMS took over the provision of medical care, until 2002, Lopez did not experience any major health concerns.  Indeed, Lopez testified that during this period he was "healthy" and the medical records reveal that he was seen only rarely for routine testing and minor issues.

On May 9, 2002, Lopez starting vomiting blood and was taken to South Jersey Hospital.  The doctors there found that Lopez had serious esophageal varices, which were causing the bleeding.  The doctors suspected at that time that Lopez had HCV and, once he was stabilized, transferred him to St. Francis for further treatment on May 11, 2002.  At St. Francis, an ultrasound of Lopez's liver was conducted before he was discharged back to the prison infirmary on May 13, 2002.  Lopez was monitored in the prison infirmary until May 29, 2002.

On July 9, 2002 Lopez was treated for a nose bleed and referred for an HCV screening.  On July 23, 2002, Lopez tested positive for HCV and was counseled about the disease by a clinic nurse.  On August 21, 2002, Lopez was seen for follow up care, received additional HCV education, and was informed of his interferon treatment options.  Although Lopez initially decided against drug therapy following a gastrointestinal consultation on

October 11, 2002, later that month he requested drug therapy. Following a number of consultations and tests, which took place throughout November, December, and January, Lopez began drug therapy for his HCV in February 2003.  Prior to the commencement of the drug therapy Lopez was made aware of the risk of side effects posed by the treatment.

On March 13, 2003, Lopez's drug therapy was halted after poor test results.  The therapy was subsequently renewed in April at a lower dosage, but ultimately had to be halted again on May 14, 2003 when Lopez's platelet count fell too low.  Lopez's drug therapy was resumed again on May 28, 2003 and halted again on July 21, 2003 due to his poor response to the treatment.  Lopez continued to receive regular monitoring for his condition, which was determined to be "stable," over the course of the following years.  On February 22, 2006, Lopez signed a refusal of further drug therapy.  He has since regularly consulted with specialists regarding his candidacy for a liver transplant.

Lopez filed an eleven count complaint requesting declaratory, injunctive and monetary relief against Defendants. Lopez alleges that Defendants were deliberately indifferent to his serious medical needs in violation his Eighth Amendment rights (Counts I and II), that they violated the equal protection clause under the Fourteenth Amendment (Count III), and violated the Americans with Disabilities Act ("ADA") 42 U.S.C. §§ 12131,

6

et seq. (Count X).  He also brings claims of fraud against all
Defendants (Count XI), as well as claims of negligence (Counts IV
and V), medical malpractice (Counts VI and VII), and both
intentional and negligent infliction of emotional distress
(Counts VIII and IX) against the CMS Defendants and St. Francis.
Defendants now seek summary judgment on all counts.

**III.  <u>DISCUSSION</u>**

    **A.   Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied
that "the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986); Fed. R. Civ.
P. 56(c).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
248 (1986).  A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit.  <u>Id.</u>  In considering a motion for summary
judgment, a district court may not make credibility
determinations or engage in any weighing of the evidence;
instead, the non-moving party's evidence "is to be believed and

all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**B.   42 U.S.C. § 1983 Claims**

All three groups of defendants seek to dismiss Lopez's section 1983 claims on summary judgment.  To state a claim under 42 U.S.C. § 1983, a plaintiff must show that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived him of his rights, privileges, or immunities secured by the Constitution or laws of the United States.  See, e.g., Shuman ex rel. Shertzer v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005); Mark v.

Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995); Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993). There is no dispute that Defendants were acting under the color of state law at all times relevant to this case. Accordingly, the only question is whether Lopez was denied a constitutional or other legal right.

The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. 97, 104-105 (1976). To state a claim for violation of this Eighth Amendment right, a prisoner must show that: (1) their medical needs are serious; and (2) the defendants showed deliberate indifference to those needs. Id. There is no dispute that Lopez's HCV presented a serious medical need. Defendants argue, however, that they were not deliberately indifferent to Lopez's serious medical needs in violation of the Eight Amendment. Moreover, State Defendants assert that they are shielded from liability by the Eleventh Amendment. State Defendants and St. Francis also both argue that vicarious liability does not exist under Section 1983.

As a preliminary matter, the Court notes that "Plaintiff does not oppose [St. Francis's] Motion with respect to Plaintiff's 42 U.S.C. § 1983 claims." (See Pl. Opp. Br. at 1.) Therefore, Counts I and II against St. Francis shall be dismissed. The arguments of the remaining defendants will be addressed in turn.

**1.   State Defendants**

**(a) Official Capacities**

State Defendants argue that claims against them in their
official capacities must be dismissed because they are not
"persons" within the meaning of 42 U.S.C. § 1983.  The law is
clear that claims made against state officials in their official
capacities are treated as claims made against the state itself.
Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).
The Eleventh Amendment bars suits in Federal courts against
states, and this immunity applies to section 1983 claims.
Anderson v. Pennsylvania, 196 Fed. Appx. 115, 117 (3d Cir. 2006)
(citing Bolden v. SEPTA, 953 F.2d 807, 813 (3d Cir. 1991)); see
also Casilla v. New Jersey State Prison, No. 05-4590, 2006 WL
2534416, at *7 (D.N.J. Aug. 31, 2006) (finding that pursuant to
N.J. Stat. Ann. § 30:1 B-2, the NJDOC is a principal department
of the state's executive branch and courts have consistently
extended sovereign immunity to NJDOC officials in section 1983
actions) (citing Jordan v. NJDOC, 881 F. Supp. 947, 952 (D.N.J.
1995) and Snyder v. Baumecker, 708 F. Supp. 1451, 1455-56 (D.N.J.
1989)).  Since a suit against a state official in her official
capacity is not a suit against the official but rather is a suit
against the state, and the state is not a person within the
meaning of section 1983, Will, 491 U.S. at 71, Lopez's claims
against State Defendants in their official capacities are

dismissed.

**(b) Individual Capacities**

State Defendants also argue that Lopez's section 1983 claim against them in their individual capacity must be dismissed because: (1) it is improperly based upon a theory of <u>respondeat superior</u>; and (2) they were not deliberately indifferent to Lopez's serious medical needs.  A prison official can be sued for constitutional violations in her individual capacity for action she takes under color of state law.  See <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985).  A prison official, however, cannot be found liable under the Eighth Amendment for deliberate indifference to a inmate's serious medical needs unless "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994) (interpreting alleged 8th Amendment conditions of confinement claim).

"A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of <u>respondeat superior</u>." <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988); <u>see also</u> <u>Parratt v. Taylor</u>, 451 U.S. 527, 537 n. 3 (1981); <u>Hampton v. Holmesburg Prison Officials</u>, 546 F.2d 1077, 1082 (3d Cir. 1976).

Personal involvement can be shown through allegations, made with appropriate particularity, of "personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207.

Lopez argues that his theory of liability is not based on respondeat superior but on State Defendants' policy of either not diagnosing or not informing inmates of their HCV diagnoses, as well as their policy of not treating inmates with HCV. Lopez also argues that State Defendants were aware of CMS's failure to follow the FBOP guidelines and CMS's failure to address the serious issue of rising HCV rates in the prisons. In support of his argument, Lopez relies on the 1996 contract that NJDOC entered into with CMS as evidence of State Defendants' policy of not providing treatment for HCV. The 1996 contract provided for $2,838.50 per inmate per year for all medical expenses, and allowed for a per capita increases of 2.8% and 1.5%. Lopez argues that a course of treatment for HCV ranged from $7,000 to $20,000 per person. Therefore, he argues, State Defendants knew CMS could not afford to treat inmates with HCV and that in order for CMS to properly treat HCV infected inmates, the cost of treatment would have to be deferred back to the NJDOC as was previously done for treatment of HIV inmates. Lopez states that it was not until October 2002, after articles appeared in the Philadelphia Inquirer about the treatment of HCV in New Jersey state prisons, that the contract was amended to permit CMS to

pass through all expenses connected to HCV directly to the DOC.

State Defendants raise a number of arguments in response. Most notably, State Defendants assert that the individually named defendants had no personal involvement in formulating or implementing any of the alleged policies at issue.[2]  They assert that Defendant Devon Brown, Commissioner of the NJDOC, and Defendant Charles Leone, Administrator of Bayside State Prison, were not appointed until April 2002.  Additionally, they assert that the Administrator of Southern State Correctional Facility, Ronald Cathel, and the Administrator of New Jersey State Prison, Roy Hendricks, were not appointed until after Lopez left their respective facilities.[3]  State Defendants argue that since the

_____

[2]  Lopez generically named the "Warden of Southern State Correctional Facility" and "Warden of New Jersey State Prison." Naming the defendant by his or her title usually suggests that the person is named in his or her official capacity.  See Casilla, 2006 WL 2534416, at * 7 (stating that by naming the Commissioner of the NJDOC, rather than a specific person, on its face plaintiff alleges liability in his official capacity only). Lopez asserts, however, that the wardens are sued individually as well as officially and, therefore, we address the individuals in both capacities.

[3]  At the time that service of the Complaint was accepted, Cathel and Hendricks were the current administrators.  Although Lopez testified in deposition that Howard Beyer and later Willis Morton were the administrators at New Jersey State Prison while he was there from 1983 until 1996 and that a female administrator whose name he could not recall was the administrator of Southern State Correctional Facility while he was there from 1996 to 1998, Lopez testified that he did not speak with any of them about his medical condition because he did not know at that time that he had HCV.  Further, Lopez never amended his Complaint or served Beyer or Morton with the Complaint.  Even assuming *arguendo* that he properly named Beyer or Morton as the administrators, Lopez

13

above named administrators had no personal involvement with the allegations, they cannot be held individually liable.  The Court agrees.

Lopez has failed to present any evidence capable of creating a genuine issue of material fact with respect to his section 1983 claim against the administrators in their individual capacities. Lopez was housed at the New Jersey State Prison from 1983 until 1996.  However, Roy Hendricks did not became the administrator of New Jersey State Prison until December 1998.  Lopez has alleged no facts that could show any personal involvement by Hendricks in decisions regarding his medical treatment or any policies that could have affected his treatment.  Likewise, Lopez was housed in Southern State Correctional Facility from 1996 until 1998, but Ronald Cathel was not appointed administrator of the prison until July 2000.  Lopez has alleged no facts that could show any personal involvement by Cathel in decisions regarding his medical treatment or any policies that could have affected his treatment. Thus, Lopez's claims against both Roy Hendricks and Ronald Cathel must be dismissed.

The two other state defendants, Devon Brown and Charles Leone, were specifically named in the Complaint.  Brown was appointed commissioner while Lopez was in the state prison

---

has not alleged sufficient facts to show that they were
personally involved in not diagnosing or treating his HCV.

14

system, and Leone was the administrator of Bayside Prison while Lopez was an inmate there.  When both Brown and Leone were appointed in 2002, CMS was under contract to provide medical services to the prison population.  Although Lopez alleges that the NJDOC knew in 2000 that the FBOP guidelines sent to CMS in 1999 were not being adhered to, he admits that by 2002 CMS was in compliance.  Accordingly, rather than implicate Brown and Leone, this fact shows that the policy being followed by Brown and Leone was to require full compliance with the FBOB guidelines.  In fact, Lopez testified that after he spoke with Defendant Leone personally in 2002 about his recent HCV diagnosis, he was seen by CMS personnel and stated, "if I wouldn't have went [sic] to him, I probably would have never seen anybody."

Even assuming that it was the policy of the previous commissioners and/or administrators to not fully comply with FBOP guidelines or fully fund HCV treatment, Brown and Leone cannot be held individually liable for such conduct.  Lopez has not shown how either of these men had any personal involvement in any alleged policy not to follow FBOP guidelines or fund HCV treatment.  The revision to the contract with CMS shortly after they were employed by NJDOC suggests that their policy was to fund HCV treatment.

15

Moreover, with respect to the treatment of Lopez's HCV, it would have been reasonable for Brown and Leone, as non-medical professionals, to rely on the medical treatment being provided by CMS.  See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (finding that without knowledge or belief that prison doctors are mistreating or not treating a prisoner, a non-medical prison official is not chargeable with the Eighth Amendment scienter requirement of deliberate indifference).  In Spruill, the Third Circuit found that if a prisoner is under the care of medical experts, then "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." Id.  The Third Circuit reasoned that:

> Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on.  Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.  Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.

Id.; see also Thomas v. Dragovich, 142 Fed. Appx. 33, 39 (3d Cir. 2005) (acknowledging that the non-medical official could have been more helpful by forwarding grievance forms to medical staff or by speaking with them directly but that "a failure to undertake such actions or others like them does not constitute

16

deliberate indifference, and may not be legally recognized as such").

Thus, Lopez has failed to provide facts capable of creating a genuine issue with respect to whether State Defendants had any personal involvement in Lopez's HCV diagnosis or treatment, or in any policies that could have prevented Lopez's diagnosis or treatment. Accordingly, they cannot be individually liable. In light this finding, as well as the Court's determination above that Lopez cannot hold State Defendants liable in their official capacities because they are immune under the Eleventh Amendment, summary judgment must be granted with respect to Counts I and II against State Defendants.

### 2. CMS Defendants

CMS Defendants argue that Lopez cannot meet the second element of his claim because CMS Defendants were not deliberately indifferent to his serious medical needs in violation of the Eight Amendment. "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. Farmer v. Brennan, 511 U.S. 825, 837-38 (1994). A prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. Andrews v. Camden County, 95 F. Supp. 2d 217, 228 (D.N.J. 2000). Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims." White v.

17

Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).  Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. Estelle, 429 U.S. at 105-06; White, 897 F.3d at 110.

The Third Circuit has found deliberate indifference where a prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment for non-medical reasons; or (3) prevents a prisoner from receiving needed or recommended treatment.  See Rouse, 182 F.3d at 197.  The court has also held that needless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, violates the Eighth Amendment.  Atkinson, 316 F.3d at 266; see also Monmouth County, 834 F.2d at 346 ("[D]eliberate indifference is demonstrated '[w]hen ... prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment.'"); Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993); White v. Napoleon, 897 F.2d 103 (3d Cir. 1990).

Lopez argues that as a former IV drug user he was "at risk" for HCV, and therefore, the prison had a constitutional duty to screen him.  Lopez also alleges that abnormal test results of his liver should have alerted his doctors that he may have HCV.

18

However, there is no evidence that CMS was made aware of Lopez's past drug use or abnormal liver test results prior to his hospitalization for vomiting blood on May 9, 2002.  Further, in a recently decided case, this Court held that since there was no evidence presented to the Court that HCV is a potentially dangerous and easily communicable disease like Tuberculosis, there is no general constitutional duty to screen asymptomatic inmates for HCV.  See Thomas v. Correctional Medical Services, Inc., No. 04-3358(NLH), slip op. at 18-21 (D.N.J. Mar. 17, 2009).  Likewise, Lopez has not presented any evidence in this case to suggest that HCV is the type of easily communicable disease, like Tuberculosis, that requires universal screening.  Accordingly, CMS Defendants can only be found deliberately indifferent to Lopez's condition if they had some knowledge of it, but refused or delayed medical treatment for non-medical reasons.

CMS Defendants assert that they were unaware of Lopez's HCV until May 2002, and since that time, he has been provided with medical treatment.  Lopez, on the other hand, asserts that CMS Defendants had actual knowledge of his condition and deliberately failed to inform him that he had HCV or treat his condition.  In support of this assertion, Lopez relies upon several facts.  First, he argues that when CMS assumed responsibility for inmate medical care, it performed an audit of all of the prisoners' medical records for uniformity and completeness.  James J. Neal,

19

M.D., medical director for CMS, testified that in 1996-97, CMS culled and reformatted the inmates' medical records developing a standardized index throughout the state. Lopez argues that as a result of this audit, CMS should have noted that Lopez had HCV, and informed him or treated him for his condition. Lopez's understanding of this audit, however, is confused. The record reveals that the audit was only conducted to properly index and standardize the files, not to scan for particular diagnoses of the inmates. There is no evidence whatsoever that CMS learned during this audit that Lopez had HCV.

Second, Lopez argues that CMS had a policy of failing to inform inmates who had HCV or were at risk of HCV. Lopez asserts that after an article appeared in *The Philadelphia Inquirer* in 2002 about the problem of HCV in prisons, and CMS began screening, it found 445 inmates who had been diagnosed with HCV but no evidence that they were informed of their diagnosis. Lopez also asserts that only one of the 1,025 inmates in prison system documented with HCV was receiving treatment in 2002. However, Lopez has failed to provide any evidence with respect to his how any such alleged policy impacted him in particular. While this argument may provide circumstantial evidence that any alleged denial of care was done for non-medical reasons, it is not evidence that Lopez was denied any care to which he was entitled.

From the time that CMS undertook to provide medical care to the prison population in April 1996 until Lopez was treated in 2002 after vomiting blood, there is no evidence that CMS knew Lopez had HCV.  Lopez did not request to be screened or tested for HCV.  Further, the times that Lopez was treated prior to 2002 all concerned unrelated conditions such as testing for tuberculosis or syphilis.  Lopez has failed to present any evidence that should have alerted CMS to the possibility that he had HCV.

Lopez's argument that CMS should have told him that he had HCV presumes that CMS knew he had HCV and did not tell him. There is no evidence, however, that CMS had such knowledge before May 2002.  The standard for deliberate indifference requires that a defendant "knows" of the inmates's need for medical treatment but intentionally refuses to provide it, <u>see</u> <u>Rouse</u>, 182 F.3d at 197, not that a defendant "should have known."  Accordingly, CMS Defendants could not have been deliberately indifferent to Lopez's HCV prior to May 2002.

Following his May 9, 2002 hospital admission, when evidence in the record suggests that CMS may have learned of Lopez's HCV, Lopez was tested and evaluated on numerous occasions.  These tests and evaluations led to Lopez's official diagnosis with and notification of his HCV on July 23, 2002.  The chronology of these tests and evaluations, as catalogued in the report of

Lopez's own expert, Bennet Cecil, M.D., suggests that the delay in Lopez's official diagnosis, whether proper or not, was for medical reasons.  During the approximately two month period from when CMD Defendants may have first learned of Lopez's HCV to his ultimate diagnosis, Lopez was seen by medical professionals on at least eight separate occasions, and administered numerous tests. In the face of this evidence, the Court finds that no reasonable jury could conclude that CMS Defendants were deliberately indifferent to his medical condition between the time when they may have first suspected his HCV and the time it was first officially diagnosed.

Moreover, any dispute over the merits of approximately two month delay in Lopez's official diagnosis and in Lopez being informed of his decision while testing and evaluation was conducted amounts to nothing more that the type of disagreements over medical judgments that have been held to not amount to Eighth Amendment claims.  See White, 897 F.2d at 110.  Even assuming that CMS Defendants were mistaken in their course of action and Lopez should have immediately been administered and HCV test and informed of his potential condition on May 9, 2002, such a mistake in judgment would at most amount to a medical malpractice claim, not an Eighth Amendment violation.  See Estelle, 429 U.S. at 105-06; White, 897 F.3d at 110.

22

Moreover, even assuming *arguendo* that Lopez was able to demonstrate a genuine issue of material fact with respect to the delay of his diagnosis and his notification thereof, Lopez cannot demonstrate that he suffered any damages as a result of the delay.  After he initially declined drug therapy, Lopez was subsequently administered the treatment at his request until it proved uneffective.  There is no evidence in the record to suggest that this treatment would have met with any greater success had Lopez been diagnosed and told of his condition two months sooner.  Thus, Lopez has not stated a claim for deliberate indifference to his serious medical need and, therefore, the motion of CMS Defendants for summary judgment is granted with respect to Counts I and II.[4]

### C.   Equal Protection Under 14th Amendment

Lopez alleges that he was a member of a protected "class of one" and that he received different treatment from other inmates in violation of the equal protection clause of the Fourteenth Amendment.  Particularly, Lopez states that he was denied screening for HCV despite his known risk factor, past IV drug use, while other patients with different risk factors, such as HIV, were screened and monitored for HCV.

---

[4]  Having reached this conclusion, the Court need not consider CMS' argument that they were not directly involved in providing medical care to Lopez before May 2002.

The Supreme Court has recognized "class of one" equal protection claims "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (where municipality intentionally demanded a 33-foot easement as a condition of connecting plaintiff's property to the municipal water supply but only required only a 15-foot easement from other similarly situated property owners).  To successfully plead a class of one equal protection claim, Lopez must establish that Defendants intentionally treated him differently from others similarly situated without a rational basis for doing so.  See North Pacifica LLC v. City of Pacifica, No. 05-16069, 2008 WL 2026085, at *7 (9th Cir. May 13, 2008).  The complained of conduct cannot be an accident or random act, but must be intentional, discriminatory treatment directed just at just the plaintiff.  Id. (citing Jackson v. Burke, 256 F.3d 93, 96 (2d Cir. 2001)).

Lopez's allegations do not amount to a class of one equal protection violation.  The most that Lopez has alleged is that those inmates with risk factors other than HIV may not have been screened as promptly as those with HIV.  There is no evidence to suggest that Defendants intentionally, and without a rational basis, singled out Lopez and refused to screen or treat just him.

Thus, Lopez's class of one equal protection claim must be dismissed, and summary judgment is granted with respect to Count III.[5]

### D.    ADA Claim

Lopez alleges in his Complaint that his HBV and HCV are recognized disabilities under the ADA and that Defendants have excluded him from receipt of medical services and education based on his disability.  Defendants move to dismiss Lopez's ADA claim on the grounds that hepatitis is not a per se disability, and that Lopez has not alleged that his hepatitis has substantially limited any major life activity.  In response, Lopez asserts for the first time that his heroin addiction is a per se disability and that his HCV infection and advanced liver disease are qualified disabilities.  He also asserts that he suffers substantial limitation to several major life activities including walking, working, and caring for himself.

Under Title II of the ADA, a plaintiff must establish that: "(1) he is a qualified person with a disability; (2) who is

_____

[5]   The Court makes no finding as to whether a class of one equal protection claim in this context could be successful.  See Engquist v. Oregon Dept. of Agr., 128 S.Ct. 2146, 2156 (2008) (finding that class of one equal protection claim has no application in the at-will public employment context where broad discretion is used in making employment decisions).  Since Lopez has not alleged sufficient facts under this claim, we do not reach the broader question of whether such claims are appropriate in the context of medical care provided to inmates.

subjected to discrimination by a public entity, or is excluded from participation in or is denied the benefits of the services, programs, or activities of such entity; (3) because of his disability." Washington v. Correctional Medical Services, No. 05-3715, 2006 WL 1210522, at *2 (D.N.J. May 1, 2006). A disability is defined under the ADA as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(c).

Although Lopez asserts that his HCV and HBV are recognized disabilities, that is not accurate. Numerous courts have held that hepatitis is not a per se disability under the ADA. See Furnish v. SVI Sys., Inc., 270 F.3d 445, 450 (7th Cir. 2001) (finding that plaintiff's hepatitis B did not limit a major life activity); Ellis v. Mohenis Serv. Inc., No. 96-6307, 1998 WL 564478, at *3-4 (E.D. Pa. Aug. 24, 1998) (rejecting theory that hepatitis C is a per se ADA disability); Sussle v. Sirina Protection Sys. Corp., 269 F. Supp. 2d 285, 297-98 (S.D.N.Y. 2003) (finding that although hepatitis C was a "physical impairment" without a limitation on a major life activity, it does not qualify as a disability under the ADA). Indeed, in Bennett v. Correctional Medical Services, Inc., No. 02-4993, 2008 WL 2064202, at *18 (D.N.J. May 14, 2008), this Court held that the plaintiffs failed to present a claim under the ADA because they did not identify any major life activity that had been

26

impaired by their hepatitis.  As noted above, the ADA requires
that the physical impairment limit one of life's major activities
in order for it to be considered a disability.  <u>See</u> 42 U.S. C. §
12102(c).  Therefore, it is not enough for Plaintiff to claim
that he suffers from hepatitis under the ADA; he must also show
that he is limited in one of life's major activities because of
his hepatitis.

The Supreme Court has interpreted "major life activities" as
"those activities that are of central importance to daily life,"
such as "walking, seeing, and hearing."  <u>Toyota Motor Mfg.,
Kentucky, Inc. v. Williams</u>, 534 U.S. 184, 197 (2002); <u>see also
Taylor v. USF-Red Star Exp., Inc.,</u> 212 Fed. Appx. 101, 106 (3d
Cir. 2006) (listing examples of major life activities as "caring
for oneself, walking, breathing, seeing, hearing, and working").

Lopez asserts that due to his HCV infection and advanced
liver disease he suffers substantial limitation in walking,
working, and caring for himself.  These are examples of "major
life activities."  <u>See</u> <u>Taylor</u>, 212 Fed. Appx. at 106.  Lopez also
asserts that he no longer enjoys his former activities of working
in the prison, including orienting new inmates in the prison,
cutting hair, teaching classes, and working as a clerk.  He
claims that he cannot stand on his feet for long periods of time
and must elevate his feet to reduce swelling.  As such, Lopez has
presented enough facts to go to a jury on the issue of whether he

is a qualified person with a disability under the first element of his ADA claim.

Lopez has not, however, presented sufficient evidence to create a genuine issue of material fact as to whether he was subjected to discrimination, or excluded from participation in, or denied the benefits of the services, programs, or activities by Defendants because of his alleged disability.  Defendants argue that Lopez does not have a viable ADA claim because he has simply argued that he was denied treatment for his HCV.  In Iseley v. Beard, 200 Fed. Appx. 137, 142 (3d Cir. 2006), the Court held that the plaintiff's claim that he was denied medical treatment for his disabilities is not encompassed by the ADA's prohibitions.  In order for a claim to be cognizable under the ADA, a plaintiff must be able to show that he was excluded from services or programs "on the basis of his disability."  Id. (citing Bryant v. Madigan, 84 F.3d 246, 248 (7th Cir. 1996)).  Here, Lopez has not alleged facts that could show that he was denied services because he had HCV.  Rather, his claims are that Defendants refused to treat his HCV, which is addressed as a part of his claim for deliberate indifference to his medical needs.  Thus, Lopez has failed to present a viable ADA claim based upon his hepatitis.

Alternatively, Lopez asserts in his Opposition Brief that he suffers a per se disability under the ADA since he is a

recovering heroin addict.  In <u>New Directions Treatment Serv. v.</u>
<u>City of Reading</u>, 490 F.3d 293, 308 (3d Cir. 2006), the Third
Circuit stated that "recovering heroin addicts are presumptively
'qualified' persons under the ADA and Rehabilitation Act."
Defendants argue that not only has Lopez raised this disability
for the first time in his opposition to the motion for summary
judgment, but that the issue in <u>New Directions</u> was whether the
plaintiffs were qualified to assert a claim under the ADA in an
employment context and, therefore, the case is not analogous to
the present matter.

     Although Defendants argue that <u>New Directions</u> is not
analogous to this case because it was an employment case, the
Third Circuit noted that while the provision concerning current
heroin users first appears at 42 U.S.C. § 12114(a), where it
applies to subchapter I of the ADA concerning employment, the
provision is repeated in the "Miscellaneous Provisions," section
making it applicable to the entire ADA.  <u>Id.</u>  Thus,
notwithstanding the "perplexing draftsmanship," the provision is
applicable outside of the employment context even if is unclear
how the provision should apply.  <u>Id.</u>

     Here, Lopez did not allege any facts in his complaint to
suggest that he was bringing an ADA claim based upon a disability
as a former heroin addict, and has not provided any facts
concerning his former heroin addiction.  Even if he properly

29

alleged his claim and even if we assume he is a qualified person
with a disability, Lopez has not alleged any facts to support a
claim that he was discriminated, excluded from or denied benefits
or services by Defendants because of his status as a recovering
heroin addict.  All of Lopez's allegations pertain to Defendants
failure to treat his HCV.  The only mention of his former drug
use was an allegation that Defendants should have been aware that
Lopez was at risk for HCV.  Indeed, Lopez's statement that he
used to work in the prison orienting new inmates, cutting hair,
teaching classes, and working as a clerk suggest that he was not
discriminated against because of his former heroin use.  Thus,
Lopez's ADA claims must be dismissed, and summary judgment is
granted with respect to Count X.

**E.    Common law claims**

By Order and Opinion entered on June 20, 2006,[6] the Court
dismissed Plaintiff's common law claims based on Defendants'
failure to properly screen, evaluate and identify Lopez's
condition because he did not obtain an affidavit of merit as
required by N.J.S.A. 2A:53A-27.[7]  However, the Court held that

---

[6]  The June 20, 2006 Order and Opinion were entered by the
Honorable Jerome B. Simandle, to whom this matter was originally
referred.

[7]  N.J.S.A. 2A:53A-27 states:

In any action for damages for personal injuries,
wrongful death or property damage resulting from an

the "common knowledge exception" to the affidavit of merit requirement applied to Lopez's claims relating to the failure to disclose or treat a known serious medical condition.

Therefore, after the Order entered on June 20, 2006, the remaining state law causes of action are Lopez's claims against St. Francis and CMS Defendants for negligence, malpractice, and intentional and negligent infliction of emotional distress, as well as his fraud claim against all Defendants with respect to the failure to disclose or treat Lopez's known HCV condition. CMS Defendants and State Defendants both argue that Lopez failed to present genuine issues of material fact with respect to the elements of the claims brought against them.  St. Francis, on the other hand, argues only that it cannot be liable because the physicians who treated Lopez were not hospital employees.  The Court will first address St. Francis' argument that the doctrine of apparent authority does not apply, before turning its

---

alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices. The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.

attention to the claims against the remaining defendants, which will be addressed in turn.

### 1. Doctrine of Apparent Authority

In its motion, St. Francis raises the doctrine of apparent authority, arguing that since there is no evidence that Lopez believed that the physicians who cared for him were employees of St. Francis, the doctrine of apparent authority does not apply and St. Francis is not liable.[8]

In Arthur v. St. Peters Hospital, 405 A.2d 443, 447 (N.J. Super. Law Div. 1979), the court took judicial notice that generally patients treated at emergency room facilities of modern-day hospitals are unaware of the status of the medical professionals working there and that, unless the patient is directed by his own physician or selects a physician while there, he is relying on the reputation of the hospital itself. Id. The court also found that "unless the patient is in some manner put on notice of the independent status of the professionals with whom it might be expected to come into contact, it would be natural for him to assume that these people are employees of the hospital." Id.; see also Basil v. Wolf, 935 A.2d 1154, 1170 (N.J. 2007) (stating that "[i]f a principal cloaks an independent

---

[8] St. Francis does not argue that Lopez has failed to meet the elements of his state law claims. Rather, it appears St. Francis seeks to dismiss Lopez's claims by arguing that apparent authority does not exist.

contractor with apparent authority or agency, the principal can be held liable as if the contractor were its own employee if it held out the contractor to the plaintiff as its own servant or agent").

Lopez testified that he did not know the doctors who treated him at St. Francis.  Rather, he argues he was taken there by the NJDOC and had no input as to where he was taken or what physicians would treat him.  There is no evidence that Lopez was put on notice as to the status of the physicians who treated him at St. Francis.  Therefore, under the doctrine of apparent authority, it was reasonable for Lopez to assume that the emergency room doctors were employees of the hospital.

Since St. Francis did not raise any additional arguments regarding Lopez's state law claims in its motion, these claims remain against St. Francis.[9]  We address CMS Defendants' and State Defendants' arguments below.

---

[9] The Court shall exercise its discretion, pursuant to 28 U.S.C. § 1367(c)(3), to retain jurisdiction over the remaining state law claims in this matter in spite of the dismissal of all of Plaintiff's federal claims.  See Growth Horizons, Inc. v. Delaware County, Pa., 983 F.2d 1277, 1284-85 (3d Cir. 1993) (stating that as the statute makes clear, the decision to exercise supplemental jurisdiction over remaining state law claims pursuant to 28 U.S.C. § 1367 is committed to the discretion of the district court).

## 2. Negligence

As set forth above, the only issue remaining with respect to Lopez's negligence claim is whether CMS Defendants were negligent in failing to disclose or treat a known medical condition. Further, the Court has already determined that there is no evidence to suggest that CMS Defendants had any knowledge of Lopez's HCV prior to May 2002.  Lopez was first informed of his HCV on July 23, 2002.  Accordingly, at most CMS Defendants failed to disclose a known medical condition for approximately two months.  The question thus becomes whether Lopez has presented sufficient evidence to create a genuine issue of material fact with respect to whether CMS Defendants were negligent in not disclosing the fact that Lopez had HCV to him approximately two months earlier.

"For negligence to constitute a cause of action, a plaintiff must prove three elements: a duty or obligation, a breach of that duty, and causation to the damages, i.e., the breach caused the plaintiff's injured." See Elizabethtown Water Co. v. Hartford Cas. Ins. Co., 998 F. Supp. 447, 455 (D.N.J. 1998) (citing Prosser & Keeton on the Law of Torts 164-65 (5th ed. 1984)).  The Court is convinced in this case that Lopez has presented sufficient evidence to create genuine issues of material fact regarding whether CMS Defendants owed Lopez a duty to promptly disclose his HCV to him, as well as whether that duty was

34

breached by the approximately two month delay in disclosing Lopes's condition to him.  However, Lopez has failed to present sufficient evidence to create a genuine issue of material fact with respect to whether the approximately two month delay in notifying him of his condition caused him to suffer any injury.

Doctors at South Jersey Hospital, where Lopez was referred by CMS Defendants for treatment, first suspected that Lopez had HCV on May 9, 2002.  However, Lopez was not officially diagnosed with or informed of his HCV until July 23, 2002.  Following his diagnosis, Lopez waw counseled about the disease by a clinic nurse, received HCV education, and was informed of his interferon treatment options.  Lopez then decided against drug therapy.  Although he later changed his mind and requested drug therapy, the treatment had to be halted on numerous occasions for poor results and certain side effects.  Ultimately, Lopez signed a refusal of further drug therapy.

Even assuming the CMS Defendants knew that Lopez had HCV on May 9, 2002, when doctors first suspected it, Lopez has failed to present any evidence suggesting that his response to drug therapy would have been any different.  Absent such evidence, Lopez cannot demonstrate that he suffered any damages as a result of the delay and, therefore, cannot present a viable claim for negligence.  CMS Defendants' Motion for Summary Judgment will therefore be granted with respect to Count IV, which must be

dismissed in its entirety.

### 3.   Medical Malpractice Claims

Lopez's medical malpractice claim is also limited to only whether CMS Defendants committed medical malpractice by failing to disclose or treat a known medical condition by the Court's prior ruling on June 20, 2006.  As set forth above, since there is no evidence that CMS Defendants had any knowledge of Lopez's HCV prior to May 2002, any alleged malpractice can only be based upon a failure to disclose or treat Lopez's HCV during the approximately two month window from when CMS Defendants may have first learned that Lopez had HCV to when Lopez was first informed and treatment commenced.

Under New Jersey law, "[a] Plaintiff claiming medical malpractice 'must prove the applicable standard of care, that a deviation has occurred, and that the deviation proximately caused the injury.'"  Gordon v. Matez, No. L-938-03, 2006 WL 3299180, at *3 (N.J. Super. App. Div. Nov. 15, 2006) (citing Verdicchio v. Ricca, 843 A.2d 1042, 1055 (N.J. 1985)).  "An action for medical malpractice 'is a kind of tort action in which the traditional negligence elements are refined to reflect the professional setting of a physician-patient relationship.'"  Id.

In order to succeed in a medical malpractice claim, the plaintiff must establish the standard of care through expert

testimony.  Rosenberg v. Cahill, 492 A.2d 371, 374 (N.J. 1985).
An expert witness cannot establish a standard of care merely by
expressing his personal opinions.  Fernandez v. Baruch, 244 A.2d
109, 112 (N.J. 1968).  "The expert testimony must relate to
generally accepted medical standards, not merely to standards
personal to the witness."  Id.  "Whether the doctor has committed
an act of malpractice depends not on the outcome, but on whether
the doctor adhered to the applicable standard of care."  Morlino
v. Medical Center of Ocean County, 706 A.2d 721, 732 (N.J. 1998).
"The physician's exercise of judgment is to be evaluated not on
the basis of the physician's good faith or honesty, but solely on
whether it falls below an objective standard of care."  Id. at
733.

Here, even assuming *arguendo* that evidence existed that CMS
Defendants deviated from the standard of care in how promptly
they informed Lopez of his condition or commenced treatment,
there is no evidence that he suffered any harm as a result of the
approximately two month delay.  As set forth above, Lopez has
presented no evidence that he would have responded to treatment
had it been commenced two months sooner.  Indeed, the report of
Lopez's expert, Bennet Cecil, M.D., provides that Lopez's "best
chance of cure was in January 1999 when Rebetron was available
and his liver disease was less advanced."  That was over three
years before there is any evidence that CMS Defendants had

37

knowledge of Lopez's HCV.  Nowhere in his report does Dr. Cecil suggest that Lopez's chances of recovery would have been improved with two months of prior notice.  Absent such evidence, Lopez cannot demonstrate that he suffered any damages as a result of the delay and, therefore, cannot present a viable claim for medical malpractice.  CMS Defendants' Motion for Summary Judgment will therefore be granted with respect to Count VI, which must be dismissed in its entirety.

### 3.    Infliction of Emotional Distress

Lopez's emotional distress claims are also limited to only CMS Defendants' alleged failure to disclose or treat a known medical condition by the Court's prior ruling on June 20, 2006. As set forth above, since there is no evidence that CMS Defendants had any knowledge of Lopez's HCV prior to May 2002, any emotional distress claims can only be based upon a failure to disclose or treat Lopez's HCV during the approximately two month window from when CMS Defendants may have first learned that Lopez had HCV to when Lopez was first informed and treatment commenced.

To state a claim for intentional infliction of emotional distress ("IIED") under New Jersey law, "a plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Buckley v. Trenton Saving Fund Soc., 544 A.2d 857, 863 (N.J. 1988).  In

order to establish a claim for negligent infliction of emotional
distress ("NIED") under New Jersey law, "a plaintiff must prove
that defendant's conduct was negligent and proximately caused
plaintiff's injuries." Williamson v. Waldman, 696 A.2d 14, 17-18
(N.J. 1997).

Lopez's claims for IIED and NIED are predicated upon his
claims for negligence and medical malpractice.  Further, Lopez
relies entirely upon the facts set forth in support of his
negligence and medical malpractice claims to also support his
IIED and NIED claims.  Where a plaintiff's emotional distress
claims rely solely on the factual allegations set forth in his
medical malpractice and negligence claims, he must be able to
present expert testimony establishing that the defendants
deviated from the professional standard of care and that the
deviation resulted in his emotional distress to prove his
emotional distress claims.  See Romano v. Brown, No. 04-4346,
2006 WL 2376913, at *11 (D.N.J. Aug. 16, 2006) (noting that the
New Jersey Supreme Court has looked to whether the underlying
factual allegations in an emotional distress claim require proof
of deviation from the professional standard of care); see also
Couri v. Gardner, 801 A.2d 1134, 1141 (N.J. 2002); Risko v.
Ciocca, 812 A.2d 1138, 1142 (N.J. Super. App. Div. 2003).

Here, even assuming arguendo that evidence existed that CMS
Defendants deviated from the standard of care in how promptly

39

they informed Lopez of his condition or commenced treatment, as the Court did above, there is no evidence that the approximately two month delay caused Lopez to suffer severe emotional distress as a result.  At the summary judgment stage, Lopez may not continue to rely solely upon mere allegations and vague statements.  Saldana, 260 F.3d at 232.  It is not enough to simply assert that "Plaintiff may recover for emotional distress," as Lopez does in his Opposition Brief.  Rather, he must identify specific facts and affirmative evidence that is capable of creating a genuine issue of material fact with respect to whether he suffered severe emotional distress as a result of the approximately two month delay in notifying him of his condition or commencing treatment by CMS Defendants.  See Anderson, 477 U.S. at 256-57.  Lopez has utterly failed to do so in this case.  CMS Defendants' Motion for Summary Judgment must therefore be granted with respect to Counts VIII and IX, which shall be dismissed as to CMS Defendants.

### 4.  Fraud

CMS and State Defendants both argue that Lopez has failed to present sufficient evidence to create a genuine issue of material fact with respect to his fraud claim.  "In order to succeed in an action for common law fraud, a plaintiff must show: '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an

intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" <u>Flores v. Murray</u>, No. L-769-05, 2007 WL 3034512, at *11 (N.J. Super. App. Div. Oct. 19, 2007) (citing <u>Gennari v. Weichert Co. Realtors</u>, 691 A.2d 350, 367 (N.J. 1997)).  The elements for fraud "must be proven by clear and convincing evidence."  <u>Id.</u> (citing <u>Simpson v. Widger</u>, 709 A.2d 1366 (N.J. Super. App. Div. 1998)).

Lopez does not allege sufficient facts to create a genuine issue regarding his claim for fraud against CMS Defendants or State Defendants.  Lopez has not presented any evidence capable of showing that either CMS Defendants or State Defendants knew he had HCV and materially misrepresented that fact.  Rather, the alleged facts only support a conclusion that Defendants were unaware of Lopez's HCV diagnosis until 2002 and CMS informed him of that diagnosis within two months.  Thus, the motions of both CMS and State Defendants must be granted with respect to count XI, which shall be dismissed as to those defendants.[10]

---

[10] Having determined that summary judgment on behalf of State Defendants on all claims brought against them, the Court need not reach their argument that prospective injunctive relief is unavailable under the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626.

IV.   **CONCLUSION**

For the foregoing reasons, State Defendants' Motion for Summary Judgment is granted, St. Francis's Motion for Summary Judgment is granted in part and denied in part, and CMS Defendants' Motion for Summary Judgment is granted.

An Order consistent with this Opinion will be entered.


Dated: June 30, 2009            s/ Noel L. Hillman
                                HON. NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey